No. 64.—ELIJAH COOK, plaintiff in error, *vs.* THACKER V. WALKER and others, defendants in error.

[1.] By the Common Law, the word "*heirs*" is necessary to be employed in a grant, in order to pass an inheritable fee: but, under the Act of 1821, words of restraint must be added, in order to carry a less estate.

[2.] Whenever an estate is given, in Georgia, either by deed or will, to a person, generally or indefinitely, with the unlimited power of disposition annexed, it invariably vests the absolute fee in the first taker; and neither a remainder, nor an executory devise, can be limited over, upon such an estate.

[3.] Where the donor or testator, gives to the first taker an estate *for life* only, by certain and express words, and annexes to it a power of disposal, in that particular and special case, it has been held, that the donee or devisee for life, will not take the fee, notwithstanding the distinct gift of the power of disposition. Wherever a fee simple is given, by apt and appropriate words, to the first taker, with the addition of the absolute power of disposal, in such case, the fee will never be cut down or restricted to a life-estate, by implication.

[4.] "When a principle is settled, no conjecture or private imagination, can shake a rule of law, which must govern." (*Per Lord Mansfield, in Cowper*, 355.) No intention, however manifest, can contravene the positive rules of law—technical though they may be.

[5.] Supplemental bills may be sanctioned by the Judges of the Superior Courts, at Chambers and during vacation—reserving to the opposite party the benefit of exception.

[6.] On an *ex parte* application, to file a supplemental bill, the Chancellor will examine the question, so far as to see that the privilege is not abused, for the purposes of vexation and delay to the defendant; and in a doubtful case, he may require notice to be given beforehand, of the application, to the defendant.

[7.] It is not competent for the Judge of the Superior Court, to compel a defendant to appear before him at Chambers, out of the county of the defendant's residence, and where the cause is pending, to answer interrogatories, with a view to take the property in controversy, out of his hands, and place it in the possession of a receiver.

[8.] The Chancery powers of the Superior Courts considered.

[9.] Rule of Equity Practice, adopted by the Judges, in Convention, in July, 1796, at Louisville, prescribing the mode in which their Equity powers were to be carried out.

[10.] The records of the older counties in this State, establish the fact, that both before and subsequent to the Judiciary Act of 1799, the Superior Courts of Georgia were in the constant habit of exercising all the Chancery powers, which appertained to Courts of Equity, in England, so far as the same were suited to our circumstances and form of government. The same proof is furnished, by the Reports of the Messrs. *Charltons*, father and son—the volume of decisions made by the Superior Courts of this State, and published by authority of the Legislature; as well as by *Dudley's Reports*, of the cases decided by the Judges, in Convention. The fact, as to the extent of the Equity powers exercised by our Courts, is verified by the experience and practice of the bar, throughout the State. There are numerous Acts, in our Statute Book, which recognize the existence of Equity powers, in our Superior Courts, which have no where been conferred expressly by the Legislature.

[11.] Acts have been passed by the General Assembly, regulating the Equity Jurisdiction of the Superior Courts, in certain cases; but they were not de-

signed to delegate any new power, but were either declaratory of the law as it already existed, or directory, as to the mode of its application.

[12.] No Act has been passed, prohibiting the exercise of any Equity power, by the Superior Courts. All has been conceded or acquiesced in, in this respect, which has been claimed.

In Equity, in Harris Superior Court.  Decisions by Judge CRAWFORD, March Term, 1854.

The questions in this cause, arose upon the construction of the following marriage settlement :

GEORGIA, HARRIS COUNTY :

Whereas, a marriage is about to be solemnized between Elijah Cook and Mary V. Walker, both of the county of Harris and State of Georgia ; and whereas, the said Mary V. is possessed, in her own right, and as of her own property, of a large amount of property—consisting of lands, negroes and stock, of all kinds, money and choses in action, and it is desired and agreed between the said Elijah Cook and the said Mary V. Walker, that she, the said Mary V. should have the entire control, rents, issues and profits resulting from and growing out of the said property, and that the title to said property should vest and be in some proper person, for the use, benefit and control of the said Mary V. Walker. *Now this indenture,* made and executed this 18th November, 1834, between Mary V. Walker and Elijah Cook, her intended husband, of the one part, and William G. Walker, of the county of Harris and State aforesaid, of the other part— *Witnesseth,* that the said Mary V. Walker and Elijah Cook, for and in consideration of the said marriage, about to take place and be solemnized, have bargained, sold and conveyed unto the said William G. Walker, (all the property, specifying it,) whether in her possession now, or which may hereafter come into her possession, together with the increase of the negroes and the stock, of whatsoever kind it may be.  Also, all the property which she may hereafter become entitled to, by descent or distribution, from any person related to her, or by purchase, or by will, or gift, from any person whatsoever, together with its increase.

*To Have and to Hold* the said property, with its increase, to Wm. G. Walker, the said trustee, to and for the following uses and trusts, to-wit: that the said Mary V. Walker is and shall be entitled to take and keep possession of the same or any part thereof, and to appropriate the rents, issues and profits, in any and every way she may think proper; and that she may and shall be at liberty to sell and dispose of and to give away, either by deed, will or otherwise, all or any part of the same, as she may think proper. And the said trustee shall be bound to join in said conveyance, except by will, (which she may sign alone,) to any person or persons to whom she may desire it to be made, upon her application, in writing, to said trustee. And that the said Mary V. Walker may and shall have the entire management and control of all the said property, unrestrained, by either the said trustee or her intended husband, Elijah Cook. And in case the said Mary V. Walker should die without making any disposition of the said property, then, the said property, which may belong to her, at the time of her death, shall be divided among her children, if there be any then living; and in case there be no children, nor issue of children, living at her death, then to be divided among her mother, brother and sisters, share and share alike. The issue of a brother or sister, to share in the place of its father or mother. (The deed then provided for the selection of another trustee, by Mary V. Walker, in certain contingencies, and was signed and attested properly.)

Mrs. Cook died, without leaving children or issue of children, and without making any disposition of the property, in any manner whatever.

A bill was filed by the brothers and sisters of Mrs. Cook, against Elijah Cook, praying the delivery of this property, and account for its profits, since the death of Mrs. Cook. A supplemental bill was subsequently filed and allowed, in vacation, praying bond and security for the forthcoming of the property.

To this bill a demurrer was filed, for want of equity. The Court over-ruled the demurrer, and this is the first error assigned.

Cook *vs.* Walker and others.

Counsel for defendant then moved to dismiss the supplemental bill, on the ground that the order allowing it, was granted in vacation. The Court refused the motion, and this is assigned as error.

Counsel moved a rule *nisi* against the defendant, to show cause why he should not be attached, for failure to appear before the Judge at Chambers, in Muscogee county, to answer interrogatories filed, and to turn over the property to a receiver. This was resisted, on the ground that the defendant could not be forced to go out of his county, for such purpose. This was over-ruled by the Court, and this decision is assigned as error.

Judge BENNING having been formerly of counsel in this case, did not preside.

S. JONES and RAMSEY, for plaintiff in error.

INGRAM; DOUGHERTY, for defendants.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] Our first impressions, as to the Law of this case, were very strong, and subsequent examination and reflection have tended only to confirm them.

We are clear, that under this marriage settlement, Mrs. Cook took an absolute fee in all the property, real and personal, thereby conveyed; and consequently, that the remainder over, is void; inasmuch as a fee cannot be limited on a fee.

By the laws of this State, the word "heirs" is not necessary to create an estate of inheritance, by deed; for, by the Act of 1821, "all gifts, grants, feoffments, bequests, devises *and conveyances of every kind, whatsoever, of real* or personal property, thereafter made or executed, shall be held and construed to vest in the person or persons to whom the same are made or executed; *an absolute unconditional fee simple estate,* unless it be other-

wise expressed, and a less estate mentioned and limited in such gift, grant, feoffment, bequest, devise or conveyance". (*Pr's Dig.* 246, '7.)

While by the Common Law, therefore, "*heirs*" is the only word that can be employed in a grant, to pass an inheritable fee; under this Statute, words of restraint must be added, in order to carry a less estate.

[2.] We hold it to be an incontrovertible rule, then, that whenever an estate is given, in Georgia, either by deed or will, to a person, generally or indefinitely, with the unlimited power of disposition annexed, that it invariably vests the absolute fee in the first taker; and that neither a remainder or an executory devise, can be limited over, upon such an estate. A remainder cannot, because no remainder can be limited on an estate of inheritance. And an executory devise cannot, because indestructibility is an essential element of this latter estate; whereas, the unlimited power of disposition, in the first taker, is incongruous with this idea; it is *ipso facto*, a destruction of the executory limitation, whether the power be exercised or not.

[3.] And the only exception to the rule, thus broadly stated, is, where the donor or testator gives to the first taker, an estate *for life only*, by certain and express words; and annexes to it a power of disposal. In that particular and special case, it has been held, and the better opinion seems to be, that the donee or devisee for life, will not take an estate in fee, notwithstanding the distinct gift of the power of disposition. And by carefully marking this distinction, there will be found to be no confusion or collision in the authorities, upon this subject. (*Jackson vs. Robins,* 16 *Johns.* 537. *Jackson vs. Bull,* 10 *Johns.* 19. *Ide vs. Ide,* 5 *Mass. R.* 500. *Jackson vs. Delancy,* 13 *Johns.* 552. *Attorney General vs. Hall, Fitz.* 314. *Flanders vs. Clark,* 1 *Ves. Sr.* 9. (In this latest case, the doctrine of the *Goldsmith's Company against Hall,* in *Fitzgibbon's Reports,* is fully sanctioned.) *Pushman vs. Filliter,* 3 *Ves.* 7. *Lord Vicount Fauconborg and Wife vs. Fitzgeral and Wife, Lord Aston and others.* 3 *Bro. Par. Cas.* 543.)

Cook *vs.* Walker and others.

[4.] But, it is contended by counsel for the defendant in error, that, admitting the rule, and that the words of this settlement gives the fee under it to the wife, that even then, it would be the duty of the Court, to cut down the fee into a life estate, in order to support the limitation over, and thereby effectuate the general and paramount intent of the parties. That technical words, it is true, are commonly to be understood in their legal sense ; yet, that where the intent is manifest, it will even control and over-rule the technical sense and legal operation of the terms employed in the conveyance.

This was the identical argument used in the leading case, of *Jackson vs. Robins*, in 16 *Johnson*, and is that which is always pressed upon Courts, in like cases. Mr. Van Buren, then Attorney General of New York, in reply, asserted, that no authority could be produced, in which a fee simple is given by apt and appropriate words, to the first taker, with the addition of an absolute power of disposal; and yet, the *fee* has been restricted to *a life estate*, by mere implication. The Court, in its opinion, appeared to acquiesce in this assumption. And after the most industrious and laborious search, we can find no case which reaches that point.

In the present instance, there was not only a reservation of the whole interest in the property, which Miss Walker possessed, but to this is super-added the unqualified and unlimited power to sell, dispose of or give away the same, or any part thereof, by deed, will or otherwise, as she might think proper.

" When a principle is settled", says Lord *Mansfield, (Cowper's Rep.* 355,) "no conjecture or private imagination can shake a rule of law which must govern".

So that, although the intention be clear, that so much of this property as remained undisposed of, at the death of Miss Walker, should go first to her children or grand-children, if she left any living; otherwise, to the complainants in the bill ; here a stubborn rule of law interposes, which controls that intention. And the mother and brothers and sisters, shall take nothing, although Miss Walker left neither children nor the representatives of such ; and although the whole property re-

mained in Miss Walker at her death. And for the reason, that if it was the intention of the instrument to give an absolute and unlimited estate to Miss Walker, the other intention, to dispose of a remainder, is. inconsistent with the first intention, and cannot prevail. Suppose the estate of Miss Walker had consisted of $1000, the *whole* of which she had appropriated, could there be any residue subsisting afterwards, in which a remainder could be created? And yet, stripped of all adventitious circumstances, this is the exact case before us.

In all the cases which I have examined, from Lord *Coke's* day to the present time, I must say, that the one under consideration furnishes the slightest pretence; for cutting down the fee simple, which vested in Miss Walker, under this settlement, to a life estate. As an example and illustration, take the case of *John Smith, T. vs. Bell and Wife,* (*Martin & Yerger,* 302,) and see how much more strongly the words there used, than here, imply a limited estate in the first taker. And yet, it was held, in that case, that the devise over, was void. The words were these: "I give and bequeath to my son, Jesse Goodwin, my young sorrel gelding, and one feather bed, to be delivered to him by my executrix, after my decease. Also, I give to my wife, Elizabeth Goodwin, all my personal estate, whatsoever and wheresoever, and of what nature, and kind, and quality, soever, after payment of all my just debts, legacies and funeral expenses; which personal estate I give and bequeath to my wife, Elizabeth Goodwin, to and for her own use and benefit *and disposal, absolutely. The remainder of said estate, after her decease, to be for the use of the said Jesse Goodwin".*

Here is an express devise of the remainder, in the last sentence of the last clause of the will, to Jesse Goodwin; but the Court said it could not have effect; because, it was inconsistent with the absolute power of disposition, for her own use, conferred on Elizabeth Goodwin, the first taker. Cases, to the same effect, might be multiplied to an indefinite extent, both from the English and American Reports. But it would be an act of supererogation, to pursue this point any further. This

current of decisions is not now questioned in any Court, nor by any author.

Surely it cannot be necessary, at this day, to show that no intent, however manifest, can contravene the positive rules of law. Had the property been given to Miss Walker, for life only, with remainder to *the heirs of her body*, and in default of such heirs, to the present complainants, this being an estate tail, no one would doubt but that the fee would vest in Miss Walker, notwithstanding she took a life estate, only, by the terms of the instrument; and this, too, simply because the intention must yield to the unbending rules of the law, technical though they may be. What power has this Court to prevent the same result, in this instance? That the creation of an estate tail, by deed or will, shall vest the fee in the first taker, is not a more inflexible doctrine, than that an indefinite conveyance, with unlimited power to give, sell or devise, shall produce the same result.

But, it has been asked, what object could Miss Walker have had in making this settlement? We answer—In the first place, to protect the property from the marital rights of Elijah Cook, her intended husband; and secondly, to secure to herself, not only the usufruct, but the power of disposition over it. These were motives sufficiently operative, to influence her to enter into this contract.

But, it is said that this is a trust estate, and that consequently, the principle we have been endeavoring to establish, does not apply. Wherefore? Ingenious counsel have failed, with all their industry, to assign any reason, or produce any authority, which would make a distinction. We apprehend none exists.

Again, it is argued, that Mr. Cook is estopped by his deed, from disturbing the title of the complainants. The defendant remains passive. He is in possession of the estate. The complainants seek to recover it out of his hands, as remaindermen, under this marriage settlement. But when they exhibit the evidence of their title, it turns out that the limitation over,

to them, in this property, is void ; the absolute and unqualified interest in and to the same having been previously disposed of to another. Nothing *remaining*, therefore, to the complainants, they have no standing in Court.

[5.] Had the Judge the right to sanction the supplemental bill, at Chambers ? We think he had. If the Judges of the Superior Courts have authority to sanction original bills during vacation, it would seem to include, necessarily, the power of sanctioning a supplemental bill, which is in the nature of an amendment to the original. It must be understood, however, that it is done, with the right of exception to the opposite party.

[6.] On an *ex parte* application, to file a supplemental bill, the Chancellor examines the question, so far as to see that the privilege is not abused, for the purposes of delay and vexation to the defendant. *Eager vs. Price*, (2 *Paige*, 333.) And in a doubtful case, the Chanceller may direct notice to be given, beforehand, of the application to the defendant. (*Ib.*)

[7.] As to the third ground of assignment, that is, the power of the Court to compel the defendant to appear before him at Columbus, to answer to interrogatories, with a view to dispossess him of the property in controversy, and to place it in the custody of a receiver, we think the Judge had no such right. The case was pending in Harris county ; the defendant resided there ; and in view of the constitutional privilege accorded to every citizen, of having his rights adjudicated in the county where he lives, we hold that the investigation should have been had in Harris, and not in Muscogee. Parties have rights which may not yield, even to Judicial convenience.

[8.] The question has been argued at great length, as to the Chancery powers of our Superior Courts. In my humble opinion, the inquiry is rather curious than profitable ; for whether its jurisdiction be deducible from the Adopting Statute of 1784, or the Judiciary Act of 1799, and its predecessors, or from any other source, one thing is certain, namely : that for fifty years, our Superior Courts have been exercising, without let or hindrance, the powers usually appertaining to Courts of Equity in England and other States of this Union.

Cook *vs.* Walker and others.

[9.] As early as July, 1796, the following rule of Equity Practice, was adopted by the Judges of the Superior Courts at Louisville, and was signed by W. Stephens, Benjamin Tali-. aferro, W. Few, D. B. Mitchell and H. Caldwell : "where cases, in the first instance, require the power of a Court of Equity, the mode of proceeding shall be by bill or petition ; and the usual process of subpœna shall issue, and copies of bill and subpœna be served on the defendant, if in the State, as in Common Law cases ; if out of the State, the subpœna shall be published six months, in one of the public Gazettes, to bring in the defendant to answer. The defendant, on appearance, shall have such reasonable time to answer, as the Court shall find to be equitable ; when the defendant remains in default or contempt, the plaintiff shall be entitled to have his bill so far confessed, as to justify an interlocutory order being pased thereon ; and which shall entitle the complainant to have his case, *ex parte*, submitted to the Jury, who may decree upon the merits of the case laid before them". (*Minutes of Wilkes Superior Court, November Term*, 1796.)

What cases, pray, did then, as now, require the powers of a Court of Equity, in the first instance? All, unquestionably, where a Common Law remedy was not adequate. To this extent, then, at least, this rule, adopted during the last century, recognizes Equity powers, as existing in the Superior Courts of this State. And, I apprehend, there never was a time, from the settlement of the Colony in 1732, to the present period, when, for all practical purposes, less power than this was lodged in the Judiciary Department of the Government, under every change and form of organization.

[10.] By reference to the early records of the older counties of the State, the fact is established, that both before and subsequent to the Judiciary Act of 1799, the Superior Courts of Georgia were in the constant habit of exercising all the Chancery powers which were usual to Courts of Equity in England.

Similar proof is furnished by the elder *Charlton's Reports*. At page 94, is a very learned and elaborate opinion, in Equity,

in 1807, founded upon the doctrine of *escheats.* There are several cases, praying injunctions to stay proceedings at Law, under various pretexts; and among the rest, *fraud* is the basis of the application, in one of the cases. There are one or two bills for specific performance. I beg leave to dwell, however, with more particularity, on *ex parte, Paul Grimball, page* 153, (1808.)

This was a bill in Equity, stating that several judgments had been obtained at Law, against the complainant, for nearly $5,000, while he had a judgment in his favor, for 8,000 dollars, suspended by an appeal; that executions had been issued against him, and a sale threatened, which, if it took place, would prove ruinous to the complainant, inasmuch as, owing to the embargo laws, double the property would be sacrificed now, at a forced sale, which it would have required only four months before, to pay the judgments; and praying an injunction to delay any farther proceedings at Law, for the present.

The Judge, after delineating in glowing language the pecuniary distress of the country, and adverting to the fact, that it was of sufficient magnitude as to have required an extra session of the Legislature, which had adjourned, however, without passing any suspension or alleviating Act, asks, "cannot relief be afforded by this Court"? And he continues, "I have given to the power with which the Law and the Constitution have invested me, their full deliberation; and, although I do not possess *all* the powers of a Lord Chancellor", (why?) "*because, by our local system, the interposition of a Jury is required in Equity causes, yet that system cannot and does not interfere with these matters in Chancery, which, in their nature, must be exclusively referred to the discretion of the Court. Of this nature, I consider the application for writs of injunction*".

This was the view taken by a learned Judge, nearly a half a century ago, of the Equity powers of the Superior Courts in this State. That they differed only from those possessed by the Lord Chanceller in England, so far as that, by "our local system, the interposition of a Jury is required here, in

Cook *vs.* Walker and others.

Equity cases". And, accordingly, he issued his fiat, to restrain a judgment and execution at Law, because they were proceeding against equity and good conscience. Need I remark, that this is not only one of the most delicate, but questionable powers which is claimed by the Courts of Chancery?

But I propose to follow this case a step further. The Judge continues, "it is admitted by both sides, that no remedy can be had at Law. When we resort to Law, it is expected that precedents will have their full weight of authority; and, though precedents may militate with that justice which the peculiar circumstances of a particular case may require, yet, for the sake of general and uniform rules, a Judge will seldom deviate from an established and settled principle, to accommodate the circumstances of one case, however strong the reasons may be, to exempt it from the operation of precedent.— In *Doe vs. Pott*, (2 *Douglass*, 120,) Lord *Mansfield* is reported to have said : ' the absurdity of Lord *Lincoln's Case*, is shocking; however, it is now law'. This observation of his Lordship, may be selected as the most strongly illustrative of the authority given by Common Law Judges to precedent".

" A Court of Equity is not so trammeled. It is governed by uniform rules of evidence ; and, though a respect is evinced, in that jurisdiction, for precedents, yet they are seldom permitted to stand in the way of the particular circumstances of each case. A Lord Chancellor of Great Britain is almost as omnipotent as Parliament. Give him but a strong hold on an equitable principle, and he will be sure to substitute the *intention* of an Act of Parliament, for its *letter ;* he will push aside precedent for abstract honesty. What are the many cases in the Equity Reports, on the Statutes of Frauds and Perjuries, but in direct repeals of the plain and literal requisites of that all-important Statute" ?

"It is only necessary to advert to the nature of Law and Equity, to account *for the latitude of power given to the latter.* The law is stubborn and unbending; it marks out for itself a course, from which no fascination can illure—no obstacles impede. It neither looks to the right nor to the left ;

it neither relents nor forgives; it issues its mandates, and will be obeyed; it takes into view no consequences. *Fiat justitia* is its maxim, whether contemplating its operation upon a nation, or upon an individual. We perceive, at once, that such should be the nature and effects of Law. They necessarily result from that indiscriminating and eternal justice, upon which the Common Law is founded".

"Our ancestors felt, as we have felt after them, the necessity of some tribunal, armed with the attributes of alleviating the inexorableness of the Law. This tribunal is called a Court of Equity, whose decisions are guided by the particular circumstances of the case. This Court of Equity lends mercy to the Law; and steps in, as a kind mediator, between rigid justice, as established by the artificial institutions of society, and that justice which traces its origin to the laws of nature and of God".

Thus eloquently did a *Georgia* Judge discourse, in 1808, on the *large* and *beneficent* powers of a Court of Equity in this State; only *nine years* after, the Act of 1799 was passed, which, it has been supposed, curtailed the general jurisdiction of that Court, and expressly limited it to cases "*between copartners and co-executors, to compel the distribution of estates and payment of legacies, and to discover fraudulent transactions for the benefit of creditors*"!!! How forcibly, as well unwarrantable, such an assumption, or rather, I should say, *usurpation* of power, must have appeared to Berrien, Bulloch, Davis, Harris, Noel, Leake, Lawson, Stiles and Cuyler, and the men of that day! But no: not a word of complaint is found to escape their lips, as reported in the pleadings, in the numerous Equity causes in which they were constantly engaged. The record contains no demurrers, filed to the jurisdiction of the Court. The inference is irresistible—no suspicion was entertained by the authors or cotemporaries of the Act of 1799, that it restricted the powers of a Court of Equity to the five classes of cases therein enumerated. This discovery has been reserved to a much later day. And this chronological fact should be conclusive upon the question.

Cook vs. Walker and others.

If this special grant of power, as it has been called, includes the sum total, of the jurisdiction of Chancery, what became of technical trusts—of those accidents, mistakes and frauds which are only relievable in a Court of Equity—of the wife's equity— of marriage articles—of bills for specific performance, and the thousand other cases, where the remedy at Common Law is not adequate? No provision has been made for them by sub- sequent legislation.

By examining the *Reports* of the younger *Charlton*, "of ever blessed memory"—the volume of decisions made by the Superior Courts of this State, and published in compliance with the Act of December 10, 1841 ; as well as *Dudley's Re- ports*, of the cases decided by the Judges in Convention, it will be seen, that all the powers ordinarily exercised by a Court of Chancery, in England, and which were suited to the cir- cumstances of our people, and form of government, have been claimed and exercised by the Superior Courts of this State. I need only appeal to the experience of the bar throughout the State, to establish this truth. And I think I am not mistaken in venturing the assertion, that nothing would be considered more disastrous, by the profession, generally, than for this Court to undertake to circumscribe the Equity powers of the the Superior Courts, within the very narrow limits fixed by Statute, *as claimed by counsel.*

One other thought, and I will discontinue this discussion, which, I fear, has been extended quite too far, on account of my respect for the very able and distinguished counsel, whose views I am combatting. By searching the Digest of the Laws of this State, it will be found that there are numerous Acts which recognize the existence of Equity powers in our Supe- rior Courts, which have not been anywhere expressly conferred by Statute.

[11.] By the Act of 1806, amendatory of the Act of 1802, to carry into effect the 9th section of the 3d article of the Constitution, relative to divorce, (*Cobb's Digest*, 224,) the verdict or decree of the Jury, making provision out of the pro- perty of the husband, for the separate maintenance and sup-

port of the wife and the issue of the marriage, was to be carried into effect, according to the rules of Law, "*or according to the practice of Chancery,* as the nature of the case may require".

Here, then, is a Statute passed only three years after the Act of 1799, not delegating to, but recognizing in the Superior Courts, plenary Equity powers, as to writs of *ne exeat,* bills of *quia tenet, &c.* For this was the usual machinery in Chancery, by which Ecclesiastical decrees for alimony were enforced.

Take another example—the Act of 1839, (*Cobb's Digest,* 469,) regulating proceedings in Equity. It provides, that when a complaining party seeks, through a Court of Equity, the specific performance of an agreement to convey land, and the Jury shall find in favor of the complaining party, it shall be the duty of the Court to cause the description of the land to be set forth in the judgment of the Court, and signed by the attorney of the complainant, which judgment shall be entered on the records of the Court, (if for land,) and shall be recorded in the county where the land lies; which judgment and decree shall pass the title without any act to be done by the defendant. And such judgment or decree having been recorded, shall be as effectual to transfer the property, as the deed of the defendant.

I beg to know, whence did the Courts get the jurisdiction to entertain bills for specific performance, the existence of which is assumed by this Act? It is certainly not to be found in the special grant contained in the 53d section of the Judiciary Act of 1799, nor in any other Statute, before or since.

[12.] It has been asked, why the delegation of Equity powers to the Superior Courts, to be found interspersed in our legislation from time to time, provided they were clothed with plenary authority already? Some Judge may have entertained doubts upon the subject; not so much, perhaps, as to the power itself, as to the application of it. And these Acts have been passed, not as introductory of any new power, but either as declaratory of the law, as it already existed; or

what is more probable, as directory of the mode in which the power should be exercised, as adapted to our new relations. There is one very remarkable fact, however, if my memory is not at fault, and it is this: that there is not a Statute in the Book, which was passed for the avowed purpose of negativing or prohibiting the exercise of any Equity power, by the Superior Courts of this State. All has been conceded or acquiesced in, which was claimed. The Act of 1820 complains, that Equity had drawn to itself *exclusive* jurisdiction over the five sorts of cases therein mentioned; and confers *concurrent* Common Law jurisdiction. This is all it seeks to accomplish.

To borrow the language of Chief Justice *DeGrey,* as much to show that the peculiar phraseology which he uses, is not, as it has been wrongfully supposed to be, an *Americanism,* as to express the strength of my own conviction, I must say, that to my mind, "it is a *mighty* clear case". (1 *Fearne, on Remainders, 4th American from 10th London Edition,* 64.)